## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| LISEC AMERICA, INC., | Civil No. 05-1082 (JRT/JJG) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| HEINZ WIEDMAYER and BYSTRONIC, INC., | |
| Defendants. | |

David W. Larson, **MARTIN & SQUIRES, PA**, 444 Cedar Street, Suite 2050, St. Paul, MN 55101, for plaintiff.

George R. Wood, **LITTLER MENDELSON**, 33 South Sixth Street, Suite 3110, Minneapolis, MN 55402, for defendant Heinz Wiedmayer.

Michael J. Dwyer, **GRANNIS & HAUGE, PA**, 1260 Yankee Doodle Road, Suite 200, Eagan, MN 55121, for defendant Bystronic, Inc.

This case arises out of a non-compete agreement allegedly entered into by plaintiff Lisec America, Inc. ("Lisec America") and defendant Heinz Wiedmayer ("Wiedmayer"). Lisec America brings claims of breach of contract against Wiedmayer, unfair competition against Wiedmayer and defendant Bystronic, Inc. ("Bystronic"), and tortious interference with contract against Bystronic.

This matter is before the Court on Lisec America's motion for a preliminary injunction[1] against both defendants. For the reasons set forth below, the Court denies the motion.

---

[1] Lisec America originally filed this motion as one for a temporary restraining order. The parties have had a full opportunity to brief and argue the motion as one for a preliminary injunction, however, and the Court therefore treats it as such.

## BACKGROUND

Lisec America, a Delaware corporation with its principal place of business in Minnesota, is an affiliate of Glastechnische Industrie Peter Lisec, GmbH ("Lisec Austria"), an Austrian corporation. On January 1, 1999, Lisec America began doing business in the United States and Canada, selling Lisec Austria's products. Prior to that date, Lisec Austria used "Lisec America" as a trade name for the sale of its products in North America.

Lisec Austria is in the business of manufacturing and selling glass manufacturing machines. This equipment is very specialized and expensive and the market for each type of machine is small. Due to the specialized nature of the products and the market, it is not unusual for a year or more to pass between initial customer contact and a sale of machinery. Salespeople in this industry therefore generally have extensive customer contact.

In February 2000, Wiedmayer began working for Lisec Austria as an independent contractor. The contract (translated from the original German) states that Wiedmayer is to work as a "sales consultant for Europe and overseas." (DeWeese Aff., Ex. A, Oct. 5, 2005.) In this capacity, Lisec America alleges, Wiedmayer gained an advanced and sophisticated level of knowledge concerning Lisec Austria's products. Lisec Austria paid Wiedmayer a lump sum payment of $60,000 per year for his compensation. The contract between Wiedmayer and Lisec Austria does not state that he can earn commissions.

On March 21, 2001, Wiedmayer signed an employment agreement with Lisec America in Minnesota.  The agreement states that it is to be governed by Minnesota law and it contains a non-compete agreement, stating, in part, "Employee agrees that, during the term of this Employment Agreement, and for a period of two years after the termination of this Employment Agreement, he/she shall not directly or indirectly own, manage, control, participate in, consult with, render services for, or in any manner engage in any business competing with the businesses of [Lisec America] or its subsidiaries or affiliates . . . within any geographical area in which [Lisec America] or its subsidiaries or affiliates engage or plan to engage in such business."  (DeWeese Aff., Ex. B, ¶ 1.2(b), Oct. 5, 2005.)  According to Exhibit A to the employment agreement, Wiedmayer's sales territory was to comprise roughly most of the western half of the United States and Canada.[2]  His compensation was to be a salary of $60,000 per year and commissions on sales.  Lisec America was also to establish a 401(k) plan and provide medical and dental insurance.  It is not disputed that Lisec America did not provide these latter three items.

Because Wiedmayer is not a United States citizen, he needed to obtain a work visa in order to work for Lisec America.  Lisec America alleges that Wiedmayer represented that, as a Canadian citizen,[3] he would automatically qualify to obtain the required visa.  The parties subsequently learned that Wiedmayer did not automatically qualify for a work visa, and instead he would have to obtain a visa based upon a transfer from Lisec

---

[2] Specifically, his territory included the provinces of Manitoba, Saskatchewan, Alberta, and British Columbia, and the states of Alaska, Washington, Oregon, California, Hawaii, Nevada, Arizona, New Mexico, Colorado, Utah, Idaho, Montana, Wyoming, North Dakota, South Dakota, Minnesota, and Wisconsin.

[3] Wiedmayer holds dual Austrian/Canadian citizenship.

Austria to Lisec America. Lisec America alleges that Wiedmayer did not cooperate in obtaining this visa, and that it was largely for this reason that it terminated his employment on May 28, 2004. A copy of a letter to Wiedmayer dated May 28, 2004 appears in the record as Exhibit A attached to Wiedmayer's declaration. This letter is in German, and is partially illegible, but Lisec America does not dispute that it is Wiedmayer's termination letter. The letterhead indicates that it is from Lisec Austria, and it appears to be signed by Gerhard Sonnleitner ("Sonnleitner"), an employee of Lisec Austria, on Lisec Austria's behalf.

Lisec America discovered Wiedmayer working for a competitor, which it identifies as defendant Bystronic, in May 2005. Lisec America explains the delay in bringing a motion for injunctive relief on the fact that it had difficulty locating Wiedmayer and was not able to effect service on him until September 13, 2005.

There are numerous factual disputes surrounding Wiedmayer's employment with Lisec America and Bystronic. Wiedmayer claims that Hubert Haselsteiner ("Haselsteiner"), the president of Lisec America, told him that he would not become an employee of Lisec America until he obtained the proper visa. Wiedmayer also claims that in November 2003 he met with Haselsteiner, Greg DeWeese ("DeWeese"), Lisec America's vice president, and Sonnleitner, and they told him they wanted to negotiate a new agreement as the March 2001 agreement had never gone into effect. Wiedmayer asserts that because he never obtained the visa, he never actually worked for Lisec America.

Haselsteiner denies ever telling Wiedmayer that he would not be an employee until he had a visa, and asserts that he specifically told Wiedmayer that Wiedmayer had to sign the employment agreement before he could receive sales commissions. The written contract is silent with respect to the need for a visa. Although Wiedmayer's paychecks evidently came from Lisec Austria, Haselsteiner alleges that Lisec Austria was only a conduit for payments from Lisec America. There is documentation showing that Lisec America reimbursed Lisec Austria for certain payments associated with Wiedmayer, as well as testimony from DeWeese that he supervised Wiedmayer and authorized payments to him, and generally that Wiedmayer functioned as a salesperson for Lisec America. Haselsteiner and DeWeese both deny that there was ever a November 2003 meeting at which Wiedmayer was told that his March 2001 employment agreement had not gone into effect.

Both parties agree that, in connection with Wiedmayer's application for a visa, Lisec America represented to the United States Department of Homeland Security that Wiedmayer was not a Lisec America employee. Specifically, in a letter to the Department of Homeland Security dated January 8, 2004, DeWeese, on behalf of Lisec America, wrote in support of Lisec America's petition to transfer Wiedmayer from Lisec Austria to Lisec America. Throughout the letter, DeWeese writes in terms of Wiedmayer's "proposed" position with Lisec America. On the attached petition, under the headings "Name and address of employer abroad" and "Dates of alien's employment with this employer," DeWeese typed "Glastechniche [sic] Industrie Peter Lisec" and "February 2000 to present, with no interruptions in employment," respectively.

(Wiedmayer Decl., Ex. C.)  Lisec America also does not deny that it did not treat Wiedmayer as an employee under federal or Minnesota law; for example, it never issued him W2 forms.  Lisec America contends that, because it did not pay his wages directly, he was not an "employee" for purposes of immigration, but that nevertheless, both parties performed under the contract.

According to Bystronic's submissions, Bystronic was incorporated in New York in 1978.  Two Swiss corporations, Bystronic Maschinen AG and Bystronic Laser AG, each own 50% of Bystronic.  Bystronic Maschinen AG manufactures and sells glass manufacturing equipment.  The nature of Bystronic's business is not entirely clear to the Court.  Ulrich Troesch, Bystronic's president, states that Bystronic has been manufacturing and selling industrial equipment in North America for more than 30 years.  (Troesch Aff., ¶1.)  William J. Nielsen, Bystronic's corporate counsel and secretary, states that Bystronic is not a manufacturer.  (Nielsen Aff., ¶ 4.)  Instead, Nielsen states that Bystronic's business consists of marketing products made by Bystronic Maschinen AG and Bystronic Laser AG.  Claus Rieger, an employee of Bystronic Maschinen AG, directs North American sales for Bystronic Maschinen AG, and defendant Bystronic provides delivery and service.  Bystronic alleges that it has never employed Wiedmayer and that he is an independent contractor for Bystronic Maschinen AG.

There are also numerous factual disputes concerning Heinz Wiedmayer's possession of confidential information relating to Lisec America.  While Lisec America states that it keeps its pricing and customer lists confidential, Claus Rieger, the director of sales for Bystronic Maschinen AG, asserts that in the small market in which these

companies make sales, it is common for potential customers to reveal rival companies' sale prices during negotiations, and that Lisec America and Lisec Austria do nothing to keep their prices and customer lists confidential at trade shows.

## ANALYSIS

**A.     Standard for Granting a Preliminary Injunction**

In evaluation whether a temporary restraining order or preliminary injunction should issue, courts consider (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). In balancing the equities, no single factor is determinative. *Id.* at 113. However, a movant's failure to sustain its burden of proving irreparable injury warrants the denial of the injunctive request. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987). A preliminary injunction is an extraordinary remedy, and the party seeking injunctive relief bears the burden of proving all the *Dataphase* factors. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). The central question is whether the balance of equities so favors the moving party that the Court must intervene to preserve the status quo until the merits are determined. *Hill v. Xyquad, Inc.*, 939 F.2d 627, 630 (8th Cir. 1991).

**B.     Plaintiff's Motion for a Preliminary Injunction**

   **1.     Likelihood of Success on the Merits**

For the purposes of this motion, Lisec relies on its breach of contract claim against Wiedmayer and its tortious interference with contract claim against Bystronic.

      **a.     Breach of contract**

Wiedmayer makes three arguments against Lisec America's breach of contract claim:  (1) the contract is unenforceable due to a failure of consideration, (2) the parties cancelled the agreement, and (3) Lisec America's termination of his employment also terminated the contract.  For its part, Lisec America argues that the contract is valid and enforceable, and that regardless of the terms that the parties used to designate their agreement, the fact remains that they had an agreement and both parties performed under it.

Minnesota law looks upon non-compete agreements with disfavor.  *Sanborn Mfg. Co. v. Currie*, 500 N.W.2d 161, 164 (Minn. Ct. App. 1993).  As such, unless they are ancillary to the employment contract, they must be supported by independent consideration to be enforceable.  *Id.*  Here, there are factual disputes concerning whether Lisec America paid independent consideration for its contract with Wiedmayer, or, indeed, whether Wiedmayer ever worked for Lisec America.  While there is support in the record for Lisec America's contention that it compensated Lisec Austria for payments to Wiedmayer, this is not necessarily inconsistent with Wiedmayer's contention that at all times he continued working for Lisec Austria, and that the parties abandoned the March 2001 contract due to their inability to secure a visa for him.  While Lisec America offers

evidence that Wiedmayer engaged in sales activity in the United States, this again is not inconsistent with his Lisec Austria contract, which defines his position as "sales consultant for Europe and overseas." Furthermore, Lisec America represented to the United States government in 2004 that Wiedmayer was a prospective, not a current, employee, and that Wiedmayer had been working for Lisec Austria since 2000 with no interruption. When Wiedmayer was terminated, the termination letter came from Lisec Austria, and Wiedmayer offers evidence that the parties abandoned the March 2001 contract. Lisec America disputes that evidence, but given the parties' course of conduct Wiedmayer's version of events is certainly plausible. The Court thus finds that Lisec America's likelihood of success on the merits of its breach of contract claim on the record that is now before the Court is rather weak.

### b. Tortious Interference with Contract

To succeed on a claim of tortious interference with contract, Lisec America must show (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages. *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 362 (1998). Here, Lisec America can show little likelihood of success because it offers no evidence to rebut Bystronic's evidence that it does not employ Wiedmayer. While Lisec America points out that Bystronic has not denied that it receives benefits from sales that Wiedmayer makes, and that Wiedmayer was discovered working at a "Bystronic" booth at a trade show, it makes no other argument relating to any intentional procurement of the alleged breach. The record is rife with confusingly non-specific references to various corporate entities, and

thus the assertion that Wiedmayer was found at a "Bystronic" booth simply does not establish any likelihood of success in demonstrating that the particular Bystronic entity that is a party here had anything to do with Wiedmayer's alleged breaches.

### 2. Threat of Irreparable Harm

Lisec America argues that Wiedmayer possesses detailed, technical knowledge of its products and customers that is not otherwise public, and that he had extensive customer contact while at Lisec America. Lisec America also identifies specific recent sales that it contends it lost to Bystronic as a result of Wiedmayer's activities. Bystronic and Wiedmayer dispute the extent of Wiedmayer's involvement in these sales. They also offer evidence that it is common for potential customers to reveal competitor's prices to each other during negotiations.

In general, courts will infer irreparable harm from the violation of a valid non-compete clause where the former employee came into contact with the employer's customers in a way which "obtains a personal hold on the good will of the business." *Webb Publ'g Co. v. Fosshage*, 426 N.W.2d 445, 448 (Minn. Ct. App. 1988). The inference may be rebutted by evidence that the former employee has no hold on the good will of the business or its clientele. *Id.* Here, while as a salesman Wiedmayer came into contact with customers, it is not clear from the record how much of a "personal hold on the good will" of Lisec America's business, that business being sales in North America, that Wiedmayer actually held. If he indeed ever worked for Lisec America, it was for three years at the most. The glass manufacturing equipment industry involves long lead times for sales, and thus, while Wiedmayer had time to develop relationships with some

of Lisec America's customers, it is not clear that he became so identified with the good will and reputation of Lisec America such that the company will suffer irreparable harm from Wiedmayer's continuing to work in this market. *Cf. Benfield, Inc. v. Moline*, 351 F. Supp. 2d 911, 918-19 (D. Minn. 2004) (finding a threat of irreparable harm where the employees had long careers at the former employer).

In addition, Lisec America focuses on specific lost sales. These lost sales should be easily identifiable in this small and specialized market. If Lisec America succeeds in establishing a breach of contract, which at this point looks somewhat doubtful, its money damages, in terms of lost sales, should be readily ascertainable. *See Gelco Corp v. Coniston Partners*, 811 F.2d 414, 420 (8th Cir. 1987) (stating that a party does not suffer irreparable harm if its injuries can be remedied by a suit for money damages).

Finally, Lisec America alleges that Wiedmayer is disclosing confidential information, but the only specific information it identifies is customer lists and prices, and there is conflicting evidence concerning whether this information is confidential. Lisec America offers vague allegations about Wiedmayer's knowledge of its products, but does not identify specific confidential information that Wiedmayer is divulging. *Cf. Internet Inc. v. Tensar Polytechnologies, Inc.*, 2005 WL 2453170, at *6 n.8 (D. Minn. Oct. 3, 2005) (noting the movant's failure to identify trade secrets with specificity renders the court powerless to enforce a trade secret claim). Thus, while Lisec America has offered evidence that it is suffering harm from Wiedmayer's alleged breach, its evidence of irreparable harm is not very strong.

### 3. Balance of Harms

The parties have not focused much on this issue in their briefs. At oral argument, counsel for Bystronic stated that the business and personal lives of a number of non-parties would be upset by any injunction, and that unspecified production schedules would suffer. Defendants offer no record evidence of this, however. Thus, while the evidence of irreparable harm to Lisec America is minor, there is no evidence of harm to other parties with which to counterbalance it. This factor therefore weighs slightly in Lisec America's favor.

### 4. Public Interest

There are several competing public interests at issue in this case. While public policy favors enforcement of contracts, it also favors free trade. *Benfield, Inc. v. Moline*, 351 F. Supp. 2d 911, 919 (D. Minn. 2004). While courts thus sometimes hold that this factor does not weigh in favor of either party, *id.*, this case also includes an additional public interest consideration. Lisec America is attempting to enforce an agreement embodying an employment relationship which, in connection with a petition for a visa, it represented to the United States government as non-existent. While Lisec America attempts to distinguish between the legal meanings of "employee" in various contexts, the petition clearly stated that Wiedmayer worked for Lisec Austria from February 2000 to January 2004 with no interruption, a contention totally at odds with Lisec America's stance in this case. The Court considers it not in the public interest to encourage this sort of disingenuous maneuvering. Thus, a consideration of the public interest weighs against the grant of an injunction.

Finally, this is an unusual case in which an (alleged) employer terminated an employee yet seeks to enjoin him from engaging in his livelihood under a very broad non-compete agreement. While the Court does not rely on this fact in denying the preliminary injunction, the Court observes that it finds this situation troubling, especially in light of the fact that non-compete agreements are generally disfavored. *Cf. Ecolab, Inc. v. Gartland*, 537 N.W.2d 291, 294 (Minn. Ct. App. 1995) (stating that non-compete agreements must be reasonable).

**C.     Conclusion**

Three of the four *Dataphase* factors weigh against granting plaintiff's motion. In particular, the substantial doubt that Lisec America will ultimately prevail and the fact that, should it nevertheless prevail, it will be able to ascertain and recover its money damages, renders the extraordinary remedy of a preliminary injunction inappropriate here. The Court therefore denies Lisec America's motion.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that plaintiff Lisec America, Inc.'s motion for a preliminary injunction [Docket No. 14] is **DENIED**.

DATED:    November 23, 2005                           s/ John R. Tunheim        _
at Minneapolis, Minnesota.                                      JOHN R. TUNHEIM
                                                                       United States District Judge